## JOHN WHINNERY et al., Appellants, v. MISSOURI LUMBER & MINING COMPANY.

### Division One, November 30, 1910.

1. **CONVEYANCE: Wrong Name: Tax Sale.** The grantee cannot be permitted to accept a deed in a wrong name and put it of record in that name, and then when the land has been sold for taxes to contend that he never accepted the title in that name. So that where the grantee was Whinnery, but the record of the deed named Whinney as grantee and the land was sold under a judgment for taxes in a suit brought against Whinney as record owner, Whinnery should not be permitted to recover the land in a suit against the purchaser at the tax sale by a simple showing by oral evidence that the real grantee was Whinnery. The court cannot assume, without the production of the original deed itself, that Whinnery was named as grantee therein and the mistake in the name was the error of the recorder. Especially should that be the ruling

where the patentee cnveyed to Pierson and Whiney, and Pierson to Whinney, and Whinney's son Stephen Whinney conveyed to his brother John Whinney, who is plaintiff, and whose name is John Whinnery, the assessment and suit being against Whinney.

2. ORDER OF PUBLICATION: Not Published Until After Next Term. Service is not complete until there is an order and a publication of the order. So that, where a petition is filed in vacation in a tax suit, alleging defendants are non-residents, and the clerk makes an order of publication as and for a summons to the next term, but the order is not published, and after the next term the clerk makes an order for the next term, in which he recites the former order and that it was not published, assigning no reason why it was not, and that order is published in time for said next term, the publication is good and the summons valid. The fact that the clerk made an order that was never published does not invalidate the second order which was.

Appeal from Shannon Circuit Court.—*Hon. W. N. Evans,* Judge.

AFFIRMED.

*J. W. Chilton* and *James Orchard* for appellants.

(1). The true owner's title to land is not affected by tax proceedings unless they are brought against him; and it matters not that the proceedings were brought against the record owner, if in recording the owner's deed the recorder made a mistake and recorded the name erroneously. Chamberlain v. Blodgett, 96 Mo. 482; Troyer v. Wood, 96 Mo. 478. The appellant's name is John Whinnery, and the name John Whinny, against which the tax suit was brought, is not the same, and is not *idem sonans.* Wheelen v. Weaver, 93 Mo. 430; Chamberlain v. Blodgett, 96 Mo. 482; Simonton v. Dolan, 114 Mo. 176; Geer v. Mining Co., 134 Mo. 85. (2). It was entirely competent for witness Robert Whinnery to testify to the contents of the deeds under which plaintiffs claimed title, his inability to produce the originals having been shown. Bosworth v. Bryan, 14 Mo. 575; Addis v. Gra-

ham, 88 Mo. 197; Eversole v. Rankins, 102 Mo. 488. (3). John Whinnery being the common source of title, the respondent was not concerned with the chain of title leading up to him. Graton v. Holliday Co., 189 Mo. 322; Harrison Mch. Wks. v. Bowers, 200 Mo. 219; Gage v. Cantwell, 191 Mo. 698; Cooper v. Gunter, 215 Mo. 558. (4). The issuance of the order of publication in the tax suit, relied on by respondent for service therein, by the clerk of the court in vacation, based solely upon the ground of a judicial finding made by the clerk that a previous order of publication by him issued and returnable to a previous term of his court had not been published as the law required, was wholly without warrant of law, and was void, and conferred no jurisdiction upon the court to render judgment in said tax suit. Kelly v. Murdough, 184 Mo. 377; Otis v. Epperson, 88 Mo. 131; Van Natta v. Real Estate Co., 120 S. W. 738; Harness v. Cravens, 126 Mo. 246; Parker v. Burton, 172 Mo. 91. Constructive service is in derogation of common law, is a harsh substitute at best, and is always construed strictly. Young v. Downey, 150 Mo. 317; Van Natta v. Real Estate Co., 120 S. W. 738; Tooker v. Leake, 146 Mo. 419.

*L. B. Shuck* and *Louis F. Dinning* for respondent.

Appellants have confounded a deed having the wrong name inserted therein as grantee, with the fact of the grantee therein being correctly stated and the recorder of deeds making a mistake in the recording thereof. For instance, if the deeds in question, for there are three of them, had had the names John Whinnery and Stephen Whinnery properly inserted therein, and the recorder of deeds had recorded them, naming the grantee as Whinney, and after recording the same had certified thereon that the deed had been recorded in a certain book and page, then the owner's title would not be affected by a suit for taxes brought against the name recorded instead of the true name as written in

the deed.    The authorities cited by appellants under their first point do not touch the point in issue here as we see it.    These authorities all are upon the question of a mistake of the recorder in recording the deed.  Not one of them refers to a deed in which, by mistake, the wrong name was inserted as grantee and the deed correctly recorded.


GRAVES, J.—Plaintiffs, by petition in ordinary form, under section 650, Revised Statutes 1899, sought to have declared the title to 240 acres of land in Shannon county.    Answer was a general denial with which was coupled a claim of title by defendants.    By its judgment the court decreed title in the plaintiffs for eighty acres of said land and decreed title in defendant as to 160 acres thereof.    With this decree all the plaintiffs were satisfied except John Whinnery.    In the briefs it is admitted that the other three plaintiffs at no time claimed title in the 160 acres of land involved in this appeal.    The case here, therefore, is simply a contest between John Whinnery and the defendant, and reaches this court upon the appeal of plaintiffs, taken in the usual time and form.

John Whinnery, to sustain the issues upon his part, introduced record evidence as follows:    (1) Plat book of entries of Shannon county, showing that the land in question was patented by the United States to John Berding; (2) warranty deed from John Berding to Christopher Pierson and Stephen Whiney; (3) quit-claim deed from C. Y. Pierson and wife, Delila, to Stephen Whinney; (4) quit-claim deed from Stephen Whinny and Mary J., his wife, to John Whinny.

The defendant claims title by virtue of a tax deed given under a tax sale in a tax proceeding against John Whinney and others.    In this, service was had by publication and several objections are urged as against the validity of this tax proceeding.    These questions we state more fully and discuss in the opinion.

In addition to the record evidence above indicated, one witness, Robert Whinnery, testified for the plaintiffs. His testimony is short and we reproduce it, inasmuch as upon it turns the case. This testimony was interspersed with objections, some of which were ruled upon and some not, and also interspersed with the introduction of the written documents first above described. For brevity we cut out all but the testimony proper. It thus reads:

"Q. Who was your father? A. My father was Stephen Whinnery.

"Q. Where did he reside? A. Upper Sandusky, Wyandotte county, Ohio.

"Q. Do you know of his purchasing the land in question in this county? A. Yes, sir.

"Q. Do you know whether he is living or dead? A. He is dead.

"Q. When did he die? A. In 1877.

"Q. This deed described his name as Whiney? Is that correct, or should it be Whinnery? A. It should be Whinnery.

"Q. Were you acquainted with C. Y. Pearson? A. Yes, sir.

"Q. How long did you know him? A. All my life until the time of his death.

"Q. Do you know where he lived? A. At upper Sandusky, Wyandotte county, Ohio.

"Q. Do you know whether Christopher Pearson and C. Y. Pearson were one and the same person? A. Yes, sir.

"Q. Do you know your father and C. Y. Pearson were the ones that purchased this land? A. Yes, sir."

On cross-examination he testified:

"Q. Do you know anything about this deed this record stands for, the deed purporting to be from John Berding to Christopher Pearson and Stephen Whinnery? A. Yes, sir, I saw the deed.

"Q.   Where is the deed?   A.   It is now among my mother's old papers in Grand Rapids, Michigan.·

"Q.   Who has this deed in custody?   A.   My brother there.

"Q.   You have this deed?   A.   I am pretty certain we have this deed."

On re-direct examination:

"Q.   Did you make an effort to find this deed before you came down here?   A.   Yes; sir.

"Q.   Did you find it?   A.   No.

"Q.   Did you or your brother search for it?   A.· Yes, sir.

"Q.   You couldn't find it?   A.   No, sir.

"Q.   You couldn't find the patent?   A.   No, the way the papers got mixed up, after father's death, us children, four of us, were all engaged in railroading and were away from home and mother was old and feeble and the administrator gets a guardian appointed for her.

"Q.   You have seen the deed?   A.   Yes, sir, I have seen the deed and the patent."

On re-cross examination:

"Q.   You just stated a moment ago the papers were in your brother's possession?   A.   They are.

"Q.   What search did you make before coming down here?   A.   We searched all the time we had to search.

"Q.   (By the Court):   That is indefinite.   What search did you make?   A.   I searched through all the papers at that time I could find of the heirs.

"Q.   Did you make a search through all those papers?   A.   I searched through all my brother had there.·

"Q.   Did you make search through your brother's papers in Ohio?   A.   I went there and my brother was not home, and his wife did not know anything about it.

"Q.   Did you make any search?   A.   No.

"Q. Did you make any search through your brother's papers in Logansport, Indiana? A. No, sir.

"Q. All the papers your mother had of your father's estate are among the heirs? A. Yes, sir, all that I know of."

On re-direct examination:

"Q. Did you bring all the papers you could find? A. All I could find."

On further direct examination:

"Q. I will ask you again now if you were acquainted with C. Y. Pearson? A. Yes, sir.

"Q. I will ask you if Christopher Pearson and C. Y. Pearson are one and the same person? A. Yes, sir.

"Q. Christopher is the one named in this deed? A. Yes, sir.

"Q. Did you see this deed from C. Y. Pearson to your father? A. Yes, sir.

"Defendant objects to the introduction of any further evidence in regard to the deed from C. Y. Pearson to Stephen Whinny until it was either shown that the deed was lost or destroyed. (No ruling of the court at the time.)

"Q. You say your father died. Who did he leave as heirs? A. John Whinnery, Hiram Whinnery, Joseph Whinnery and Robert Whinnery.

"Q. They are the plaintiffs in this case are they? A. Yes, sir."

On re-direct examination:

"Q. Are these heirs of your father all alive? A. Yes, sir, the last I heard of them a few days ago.

"Q. And all parties to this suit? A. Yes, sir.

"Q. Did you not say that you had the original deed from Berding and could find and produce it if you had the opportunity? A. Yes, sir, I made that statement down there to you.

"Q. I will ask you also if you did not state you could have brought it along if the attorney had called

for it? A. No, I just stated I brought all he asked me to bring.

"Q. You still believe if given the opportunity, you could produce this deed? A. I do not know. I believe it might have been found."

Robert Whinnery recalled by defendant:

"Q. You say the name is spelled Whinnery? A. Yes, sir.

"Q. Was that name ever spelled or recognized by any other spelling than that? A. A great many people will misspell it every time. We have been called Whitney, and a great many spell it with one *n*.

"Q. You say the name has been called Whiney? A. Yes, sir.

On re-direct examination:

"Q. You spell it Whinnery? A. Yes, sir.

"Q. That is the way the family spell the name, all of them? A. Yes, sir."

From this statement a discussion of all points urged can be made.

I. Plaintiff thus states his contentions in the brief:

"The defendant (respondent) claims title under a sheriff's deed for taxes, based on a judgment against John Whinney (and some other persons who never had any title to the land), which sheriff's deed we contend is hopelessly void for two reasons:

"1st. John Whinney, the owner of the land, was not sued or named as a defendant in said tax suit.

"2nd. The order of publication made in said tax suit was wholly unauthorized by law, and gave the court rendering the judgment no jurisdiction of the defendant there, John Whinnery."

Of these two contentions in their order. As we gather it, the first contention is that John Whinnery was the real owner of the land and was never sued. In other words the contention seems to be that there was a mistake in the recording of the several deeds so far

as the name Whinnery is involved, and that a mistaken record of a deed, does not make a record owner different from the real owner. Counsel do not urge that if the actual record owner is properly sued, such proceeding will not bind an unknown real owner.

It would seem to be settled law in this State that if in the record of a deed, the name of the grantee is wrongly recorded, and a suit for taxes is brought against such wrongly recorded record owner, by publication, the tax judgment will not bind the real owner, whose name has been wrongly recorded and spread of record by the officials of the county. [Troyer v. Wood, 96 Mo. 478; Chamberlain v. Blodgett, 96 Mo. 482.]

Counsel for defendant do not controvert the rule announced by SHERWOOD, J., in the two cases, supra. They contend, however, that the evidence introduced does not show that there was an error in the record of the deeds involved, and for this reason we give the testimony in full in the statement. They urge that the trial court was fully authorized to find that the deeds were properly recorded, and that John Whinney was the record owner at the date of the tax suit. They further suggest that if there was an error in the original deeds as to the name of the grantee, such error cannot be corrected in this proceeding. As to this latter contention there can be no doubt. If the original deed, as contradistinguished from the record thereof under which the plaintiff claims, showed the grantee therein to be John Whinney, then there is a substantial accord between the original and the record thereof. Not only so, but if plaintiff accepted such deed in that name and placed it of record, he is in bad grace to urge the question now. [Nolan v. Taylor, 131 Mo. 224.]

One should not be permitted to accept and place of record a deed in a wrong name, and then after taxes have been allowed to accrue, and a sale had for the same, to then say that he never accepted the title un-

der that name. In this case it is not necessary to go thus far. The trial court received the evidence as to the contents of the original deed to plaintiff's father subject to objection. The question to be determined was whether or not there had been a mistake in the recording of these deeds from Berding to Whiney, from Pierson to Whinney, and from Stephen Whinny to John Whinny. Upon the evidence, received subject to objection as it was, the court could have well said that there was no sufficient showing as to the loss of the original deeds, and for that reason there was no evidence as to a mistake in the record of the first two deeds above mentioned. The showing made as to the non-production of the originals, is, to say the least, extremely slight. But even though it be conceded that there was evidence tending to show an error in the record of the deeds from Berding to Pierson and Whiney, and the deed from Pierson to Whinney, yet there is no attempt to show that there was a mistake in the record of the deed from Stephen Whinny to John Whinny. Upon this point the judgment should not be disturbed. The plaintiff makes no attempt to show that the deed to him was in the name of Whinnery instead of Whinney and without such proof there is no showing that there was an error in the record of his deed. The other question we discuss next.

II. The next contention is, to our mind, the material question in this record. From the evidence it appears that a petition to enforce the State's lien for back taxes was filed in vacation. It further appears that in such petition was an allegation of non-residence. Upon this petition there can be no question that the clerk of the court had the right to make an order of publication. [R. S. 1899, sec. 575.] This order of publication was made in regular form to the March term of the court for year 1886, but it would seem was not published for that term. Thereafter the clerk of the court made an additional order to September term, 1886. The only

material portion of this additional order is the first part thereof, which thus reads:

"In the circuit court of Shannon county, Missouri, in vacation.

"The State of Missouri at the relation and to the use of James F. Norton, collector of the revenue of Shannon county, Missouri, plaintiff, against John Whinney, E. C. Poppleton and W. H. Stout, defendants.

"Whereas, on the 4th day of January, 1886, the plaintiff, James F. Norton, collector of the revenue of Shannon county, Missouri, by attorneys, filed in the office of the clerk of the circuit court of Shannon county, Missouri, his petition in the above entitled cause, setting forth, among other things, that defendants are non-residents of the State of Missouri and cannot be summoned in this action by the ordinary process of law, and thereupon the said clerk ordered, by an entry of record, that publication be made, notifying the said defendants of the pendency, nature and objects of this suit and requiring them to appear at the March term, 1886, of the circuit court of Shannon county, Missouri, and answer said petition; and it appearing to the satisfaction of the undersigned clerk that said order was not published for the time and in the manner required by law;"

Following the semicolon above quoted is the usual order of publication, except the clerk uses the word "again" in the first few lines thereof in this manner:

"It is therefore, again ordered by the said clerk of the circuit court of Shannon county, Missouri, in vacation, that publication be made notifying said defendants—"

As tending to shed further light upon this situation, we find the following admission in the record:

"It was thereupon admitted by the defendant that prior to the March term, 1886, of the Shannon County Circuit Court, when the petition was filed in this cause,

an order of publication was issued based upon the affidavit and allegations in petition, of non-residence of defendants, and that such order was never published, and that after the March term, 1886, and before the September term, 1886, and before the September term of the same year, the clerk of said court made another order of publication which applies to both tax suits and which is as follows:''

The material portion of the order which is involved in this suit and is covered by this admission, we have set out above. It will be observed that the admission does not state the date of the order of publication. It might have been too short a length of time for service at the March term, so far as we can gather from this admission. Nor does the new order add much light on this point unless the word "thereupon" as used therein fixes the date. The new order, by preamble, recites that the petition was filed January 4, 1886. It would crowd the clerk to have an order issued and the requisite number of publications made in time for the March term of the court, although by prompt action under section 575, supra, and section 581, which fixes the number of publications, it might have been done.

Plaintiff claims that inasmuch as the clerk had in fact made an order of publication to the March term of the court, his power was exhausted and the subsequent order was void. This is our analysis of the contention. The defendant contends that the statute then in force was broad enough to authorize the course of the clerk. The statute then in force was Revised Statutes 1899, section 575, and reads: ''Sec. 575. In suits in partition, divorce, attachment, suits for the foreclosure of mortgages and deeds of trust, and for the enforcement of mechanics' liens, and all other liens against either real or personal property, and in all actions at law or in equity, which have for their immediate object the

enforcement or establishment of any lawful right, claim or demand to or against any real or personal property within the jurisdiction of the court, if the plaintiff or other person for him shall allege in his petition, or at the time of filing same, or at any time thereafter shall file an affidavit stating, that part or all of the defendants are non-residents of the State, or is a corporation of another State, kingdom or country, and cannot be served in this State in the manner prescribed in this chapter, or have absconded or absented themselves from their usual place of abode in this State, or that they have concealed themselves so that the ordinary process of law cannot be served upon them, the court in which said suit is brought, or in vacation the clerk thereof, shall make an order directed to the non-residents or absentees, notifying them of the commencement of the suit, and stating briefly the object and general nature of the petition, and, in suits in partition, describing the property sought to be partitioned, and requiring such defendant or defendants to appear on a day to be named therein and answer the petition, or that the petition will be taken as confessed. If in any case there shall not be sufficient time to make publication to the first term, the order shall be made returnable to the next term thereafter that will allow sufficient time for such publication.''

It must be borne in mind that plaintiff for the purposes of the trial admitted that the first order had never in fact been published, and this takes some of the sting out of the clerk's admission in the second order when he recites that the first ''was not published for the time and in the manner required by law.''

Taking plaintiff's admission and this statute, how stands the power of the clerk?

Suppose on January 5, 1886, the petition had been filed, and no record entry in vacation by the clerk had been made until after the March term had elapsed, would the intervention of the term preclude the clerk

from acting? Under very similar statutes it has been held that such would not preclude the action of the clerk. [Kane v. McCown, 55 Mo. 181; Johnson v. Gage, 57 Mo. 160.]

If therefore he is precluded at all, it is by reason of the fact that he made an order which he never published or caused to be published. We hardly think this invalidates the second order under the statute, supra. The last clause of the statute provides that "if in any case there shall not be sufficient time to make publication to the first term, the order shall be made returnable to the next term thereafter," etc. Suppose the clerk discovered, after making his first order, that there was not sufficient time to make it properly returnable to the March term: he could have then and there corrected his order and made a good one returnable to the September term. Instead of so doing he waits until after the March term, and then does what he could have done prior to the March term. If, as held in Kane v. McCown, and Johnson v. Gage, supra, the intervention of one term of court did not preclude action, we are inclined to think this publication good. Service is not complete until there is an order and a publication of the order.

We are cited by plaintiff to Kelly v. Murdagh, 184 Mo. 377; Otis v. Epperson, 88 Mo. 131; Parker v. Burton, 172 Mo. l. c. 91 and Harness v. Cravens, 126 Mo. 246. These cases do not reach the point here. A review of their holdings and the statute and points held in judgment would add nothing to the two propositions involved in this case.

We are of opinion that the judgment *nisi* is right and the same is affirmed. All concur.